UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONNELL RUSH,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ROSETTO REALTY GROUP, LLC, RONALD ROSETTO, Individually and in his Official Capacity as President of Rosetto Realty Group, STEVEN HONAN, Individually and in his Official Capacity as Real Estate Agent, EMCEE PROPERTIES, LLC, and RYAN BLUMENTHAL, Individually and in his Official Capacity as President/Owner of Emcee Properties, LLC,<br><br>　　　　Defendants.<br><br>EMCEE PROPERTIES, LLC, and RYAN BLUMENTHAL, Individually and in his Official Capacity as President/Owner of Emcee Properties, LLC,<br><br>　　　　Defendants/Third Party Plaintiffs<br><br>　v.<br><br>INDIANA INSURANCE COMPANY,<br><br>　　　　Third Party Defendant. | Civ. No. 17-2506<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

　　　This matter comes before the Court upon three Motions for Summary Judgment: one filed by Plaintiff Ronnell Rush (ECF No. 28); one filed by Defendants Emcee Properties, LLC ("Emcee Properties"), and Ryan Blumenthal (ECF No. 26) (collectively, "Emcee Defendants");

1

and one filed by Defendants Steven Honan, Rosetto Realty Group, LLC ("RRG"), and Ronald Rosetto (ECF No. 27) (collectively, "RRG Defendants"). Plaintiff opposes both of Defendants' Motions (ECF No. 30), and both groups of Defendants oppose Plaintiff's Motion (ECF Nos. 29, 31). The Court has decided the Motions on the written submissions of the parties, pursuant to Local Rule 78.1(b). For the reasons stated herein, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motions are granted in part and denied in part.

## BACKGROUND

This case arises from Plaintiff Ronnell Rush's attempts to lease property to open a hair salon,[1] and from Defendants' alleged refusal to rent to or negotiate with him because of his race and gender. (*See generally* Compl., ECF No. 1.) The following facts are undisputed unless otherwise noted.

### I. Plaintiff's Attempt to Lease the Property

Plaintiff is an African American male who has been a barber for the last twenty-eight years and who currently owns his own business, Ace of Blades, where he works as a barber. (Pl.'s Stmt. of Undisputed Mat'l Facts (SOUMF) ¶ 1.) In early February 2017, Plaintiff called Defendant Steven Honan to inquire about a property available for lease in Toms River, New Jersey. (Rush Cert. ¶ 5, ECF No. 28-9; Pl.'s SOUMF ¶ 8.) Plaintiff expressed his interest in leasing the property in order to open a hair salon. (Pl.'s SOUMF ¶¶ 8–9.)

Honan works as a Sales Representative for Defendant RRG, and he shows properties on behalf of RRG and takes all directions from Defendant Ronald Rosetto, President of RRG. (Pl.'s SOUMF ¶ 41.)

---

[1] The parties variously describe the intended use as a hair salon (*see, e.g.*, Pl.'s Stmt. of Undisputed Mat'l Facts ¶ 8, ECF No. 28-17) and a barber shop (*see, e.g.*, RRG Defs.' Stmt. of Undisputed Mat'l Facts ¶ 1, ECF No. 27-2).

2

The property at issue was owned by Blumenthal and others. (Emcee Defs.' Stmt. of Facts ¶ 1, ECF No. 26-1.) Emcee Properties is the corporate entity for the property. (*Id.*) RRG entered into an agreement with Blumenthal to find potential tenants to lease the property. (Blumenthal Dep. 5:20–23, ECF No. 28-20.) As a general matter, when a potential tenant is interested in a property, Honan sends that person a letter of intent ("LOI"). (*See, e.g.*, Honan Dep. 42:16–19, 61:14, ECF No. 28-19.) A prospective tenant's signing and returning the LOI constitutes a desire to present the offer to Blumenthal, and Honan sends these signed LOIs to Blumenthal. (*Id.* 26:13–15; Blumenthal Dep. 26:9–27:1.) If Blumenthal then also signs the LOI, a lease is prepared. (*See* Blumenthal Dep. 23:5–10, 26:9–22, 27:22–25.)

On February 17, Plaintiff and a friend met Honan, Honan showed them the space, and Plaintiff and Honan briefly discussed the leasing terms. (Pl.'s SOUMF ¶ 11.) Later that day Plaintiff texted Honan saying, "I'm definitely interested in the place probably on my own but I just need about a week to get all of the finances together." (Rush Cert., Ex. D, ECF No. 28-13.) Honan responded, "OK sounds good[.]" (*Id.*) On February 21, Plaintiff texted Honan, "I wanted to let you know that I am ready with the money to get the salon, please let me know if it is still available. If so we need to talk [.]" (*Id.*) On February 22, Honan emailed Plaintiff an LOI for a five-year initial term, with two five-year renewal options. (Pl.'s SOUMF ¶ 14; Rush Cert., Ex. E, ECF No. 28-14.) The LOI provided for a price of $14 per square foot ("psf") NNN[2] in the first year, $14.50 in the second year, and $15 in the third, fourth, and fifth years. (Rush Cert., Ex. E.) It also provided for thirty days' free rent. (*Id.*)

---

[2] "A triple net lease [NNN] is a lease agreement that designates the lessee, which is the tenant, as being solely responsible for all the costs relating to the asset being leased, in addition to the rent fee applied under the lease. The structure of this type of lease requires the lessee to pay the net amount for three types of costs, including net real estate taxes on the leased asset, net building insurance and net common area maintenance." *Triple Net Lease (NNN)*, Investopedia (last visited Aug. 16, 2018), https://www.investopedia.com/terms/t/triple-net-lease-nnn.asp.

Plaintiff claims that he then attempted to negotiate with Honan for more than thirty days free in order to renovate the property and for a reduction in the rent price, and that Honan refused these amended terms. (Rush Cert. ¶ 14, ECF No. 28-9.) All Defendants deny that Plaintiff attempted to negotiate. (*See* RRG Defs.' Reply to Pl.'s SOUMF ¶ 14, ECF No. 31; Emcee Defs.' Reply to Pl.'s SOUMF ¶ 14, ECF No. 29.)

Plaintiff signed the LOI, with the original terms, and returned it to Honan on February 23. (Pl.'s SOUMF ¶ 15.)[3] Honan then emailed the LOI to Blumenthal and noted that Plaintiff "is very excited and would like to put a deal together ASAP." (Rush Cert., Ex. F, ECF No. 28-15.) Blumenthal responded that day by asking Honan, "Is this the barber?" (*Id.*) However, Blumenthal never signed the LOI. (Pl.'s SOUMF ¶ 22; Blumenthal Dep. 26:9–24.)

On March 1, Honan texted Plaintiff, "The landlord has received multiple offers and is weighing options." (Rush Cert., Ex. D.) On March 5, Plaintiff texted Honan, "I'm guessing that the space isn't available to me, but I wanted to know if you have any other places in the area available?" (*Id.*)[4] Honan responded, "The landlord decided to negotiate with the other prospective tenant. They don't have a lease, so you may still be in [the] running, but I'll look for another location in the meantime." (*Id.*) Plaintiff then wrote, "Ok, again you can let the landlord know that I am ready as early as today. But if not I am definitely looking to get in another place as soon as possible." (*Id.*) Plaintiff texted Honan again on March 9, writing:

> Good morning I'm touching basis [sic] with you to see if there is any change. But I'm also a little curious to know what was the cause of the landlord not wanting to

---

[3] RRG Defendants note a discrepancy (RRG Defs.' Reply to Pl.'s SOUMF ¶ 15) between Plaintiff's certification stating that he returned the LOI on or about February 23 (Rush Cert. ¶ 15), and Plaintiff's statement in his deposition that it took "a few days" to return the LOI after he received it from Honan on February 22 (Rush Dep. 33:4–10, ECF No. 27-7). These Defendants nevertheless admit that the LOI was returned on February 23. (RRG Defs.' Reply to Pl.'s SOUMF ¶ 15.)

[4] The exact same message was sent the next day. (Rush Cert., Ex. D.) Honan interprets this as the result of a technology glitch. (Honan Dep. 34:6–18.)

> deal with me even though I have ALL of the cash in line? The plans for my salon would be long term and just as successful or more than what was already there. . [sic] I've looked at other locations but I would rather have that location. If this landlord definitely does not want to do business with me then I will move on.

(*Id.*) Honan replied:

> There are a couple offers and I expect the landlord to execute a lease this week. But he is leaning toward another offer because that client is [a] friend of landlord['s] family. Sorry for any inconvenience this may have caused you.
> Best of luck
> Steve

(*Id.*) At some point,[5] Plaintiff contacted Edward Campos,[6] another realtor, and Campos contacted Honan. (Pl.'s SOUMF ¶ 26.) Honan claims that Campos was looking for locations on Plaintiff's behalf. (Honan Dep. 84:7–9, ECF No. 27-10.) Honan told him "they were negotiating on a lease at the current time." (*Id.* 84:15–16.) Based on this conversation, Honan believed that Plaintiff "had got another agent to represent him." (Honan Dep. 85:1–5.) Plaintiff, however, claims that while he "wanted to know whether [the property] had been rented as Honan said it would be," he "did not request Campos to pursue the leasing" for him. (Rush Cert. ¶¶ 29, 30.)

## II. Other Prospective Tenants

Meanwhile, Honan had been communicating with several other potential tenants interested in the property. (Pl.'s SOUMF ¶¶ 53, 54.) One such person was Glenn Rafferzeder.[7] (*Id.* ¶ 54.) Blumenthal knew Rafferzeder personally (*id.* ¶ 58) and believed him to have "an established business" because he had been in business for many years. (Blumenthal Dep. 12:16–23.) Honan sent an LOI to Glenn Rafferzeder on February 23. (*Id.* ¶ 54.) Like Plaintiff's LOI, it had a five-year term with two five-year renewal options. (ECF No. 28-36.) But unlike Plaintiff's

---

[5] RRG Defendants claim that Plaintiff could not have contacted another realtor after March 9. (RRG Defs.' Reply to Pl.'s SOUMF ¶ 26.)
[6] In his deposition, Plaintiff spells Mr. Campos's last name as "Kampos." (Rush Dep. 40:25–41:2, ECF No. 26-1.)
[7] Rafferzeder is sometimes referred to as "Glenn Raff" in the record.

LOI, Rafferzeder's stated a rent price of $12 psf NNN for the first five years and included installation of a new carpet and reception counter. While Plaintiff's LOI included thirty days' free rent, Rafferzeder's contained no such allowance. (*Id.*) Rafferzeder emailed Honan in response and asked if the lease term could be changed to four years instead of five because he was "possibly retiring in four years . . . and would be selling the business with the intent of keeping the office at the location." (RRG Defs.' Ex. D, ECF No. 27-9.) Honan responded:

> Usually if you were to sell a business, there is a preference to still have some time remaining on lease. A five year lease with a couple of 5 yr renewals should be a good way to go.
> If this works, please sign and return. If your preference would be an offer of 4 yrs, just let me know.

(*Id.*) Rafferzeder signed the unamended LOI (with a five-year term) on February 24 (*id.*), and it was presented to Blumenthal (Honan Dep. 61:24, 62:9–11). Blumenthal emailed back to Honan later that day:

> Looks like less than the last one [i.e. Plaintiff's offer]. New carpet and reception desk, LOL, what's he smoking.
> Nice guy, though. We can discuss after . . . .

(Honan Dep. 64:23–65:22; Pl.'s Ex. T, ECF No. 28-37.) But on March 3, Blumenthal texted Honan saying, "Looks like we should make the deal with the insurance guy." (Pl.'s Ex. U, ECF No. 28-38.) On March 10, Honan texted Blumenthal, "I spoke to Glenn. He's going to speak to his partner and get back to me." (*Id.*) But somewhere around March 15 or 16, Rafferzeder decided not to proceed (Honan Dep. 78:14–22), and Honan communicated that to Blumenthal via text on March 16 (Pl.'s Ex. U).

Honan also engaged Sonya Delgado as a potential tenant. (Pl.'s SOUMF ¶ 53.) On March 2, Honan was informed that Delgado had inquired about the space. (RRG Defs.' Ex. I, ECF No. 27-14.) On March 6, Honan sent her an LOI. (*Id.*) As with Plaintiff's and Rafferzeder's LOIs, Delgado's LOI was for a five-year term with two five-year renewal options. (*Id.*) However, the

6

listed rental price was $15 psf NNN for the first five years, and the LOI included six months' free rent. (*Id.*) But on March 7, Honan texted Blumenthal stating that Delgado was no longer interested. (Pl.'s Ex. I.)

### III. <u>Fredman's Interactions with Defendants</u>

Luann Fredman, Plaintiff's wife and a white woman, contacted Honan regarding the property. (Fredman Cert. ¶ 5, ECF No. 28-5.) On March 8, Honan and Fredman met to discuss leasing the space and replacement of the ceiling tiles and light fixtures. (*Id.* ¶ 7.) On March 9, Honan emailed Fredman an LOI for a five-year term with two five-year renewal options. (Fredman Cert., Ex. C, ECF No. 28-8.) This LOI contained a rental price of $15 psf NNN and three months' free rent. (*Id.*) On March 10, Fredman requested "a note on the agreement that any stained ceiling tiles would be replaced by the landlord and any non functional light fixtures would also be replaced by the landlord as we discussed when we met in person." (Fredman Cert., Ex. A, ECF No. 28-6.) That same day, Honan agreed and sent a new LOI, and Fredman signed and returned it. (*Id.*; Blumenthal Dep. 24:7–10.) On March 13, Honan informed Fredman that Blumenthal was on vacation and that Honan was "awaiting his decision on a few offers," and asked if Fredman had an attorney to review the lease for her. (Fredman Cert., Ex. A.) On March 20, Honan texted Fredman that Blumenthal wanted to meet with her "at space, to go over the build out." (*Id.*) Fredman, Blumenthal, and Honan met on March 22. (Fredman Cert. ¶ 15.) That same day, Honan emailed Fredman a lease agreement, which was forwarded to attorneys that same day. (*Id.* ¶ 17; RRG Defs.' Ex. K, ECF No. 27-16.) Prior to these negotiations, Blumenthal did not know Fredman; he did not personally investigate to find out what business she was in, nor was he provided by Honan with any documentation of her prior business. (Blumenthal Dep. 14:2–9.)

Fredman claims that at the March 20 meeting among herself, Blumenthal, and Honan,

7

Honan told Fredman she "would be a good fit for the space" (Fredman Cert., Ex. B at 11, ECF No. 28-7) (sometimes stated as "the right fit," *see, e.g.*, Pl.'s SOUMF ¶ 33), that the landlord wanted to keep the plaza "upscale" (Fredman Cert. ¶ 8), and that a hair salon would be a good fit with the other businesses already in the plaza (*id.*). Furthermore, Fredman alleges that, "Honan said to me that the other offer they had was not a good fit for the property because they wanted to keep it upscale . . . ." (Fredman Dep. 41:19–22, ECF No. 27-18.) Fredman took this to mean that Honan did not want to rent to an African American. (*Id.* 42:2–43:5.)[8] Though Honan was not asked about this statement during his deposition, RRG Defendants deny that the "right fit" comments were made. (RRG Defs.' Reply to Pl.'s SOUMF ¶ 15.) Blumenthal claims that he "didn't discuss any other tenants with Luann [Fredman]" and so would not have told her that she "was a better fit for the property than anyone else." (Blumenthal Dep. 23:14–17.)

## IV. **Proffered Explanations**

The parties disagree as to why Blumenthal never signed Plaintiff's LOI, and why Plaintiff was not contacted after Rafferzeder and Delgado had both expressed disinterest. Plaintiff alleges that Defendants' actions were rooted in race and gender discrimination. (*See generally* Compl.) Defendants deny this, claiming that their actions were the result of business decisions and Honan's belief that Campos had become Plaintiff's agent.

According to Blumenthal, he considered Plaintiff's LOI but "just felt that the other offers we had were the better ones to go after." (Blumenthal Dep. 11:2–5.) Specifically, Blumenthal "felt on the long term of it more comfortable" with Rafferzeder, because he had been in business for many years and thus had "an established business." (*Id.* 11:8–12, 12:16–17, 12:20–23.)

---

[8] Plaintiff says that when Fredman told him about this conversation, Fredman reported that Honan rubbed his skin when he said the other offer was not the right fit. (Rush Dep. 48:1–2.) But Fredman herself does not allege this in any of the materials presented to the Court.

8

Additionally, Rafferzeder knew Blumenthal's family (Honan Dep. 60:25–61:7), and Blumenthal attested that "there's a personal interactional relationship there" (Blumenthal Dep. 12:15–16). By contrast, Plaintiff had a startup business, which would be less desirable from a business standpoint. (*Id.* 9:2–14, 34:2–8.) Honan concurs with this explanation. (*See* Honan Dep. 68:4–8. ("Any deals that we do, landlords want to know business history, some of the qualifications of a new potential tenant, especially with startup businesses versus established local businesses.").)

While no form was used to assess the attractiveness of potential tenants for this property (Pl.'s SOUMF ¶ 47), Honan asked potential tenants general questions to get a sense of their business experience (Honan Dep. 68:19–69:3). Honan claims that once the deals with Rafferzeder and Delgado had fallen through, he did not contact Plaintiff because he believed that he "had got another agent to represent him." (Honan Dep. 85:1–5.) Instead, Honan presented Blumenthal with Fredman's LOI (Blumenthal Dep. 20:2–15), which Blumenthal claims he accepted because she offered a better rent price than Plaintiff and had prior experience operating a hair salon (*Id.* 33:15–22). However, in his deposition Blumenthal could not recall how long Plaintiff had been in business. (*Id.* 18:21–19:3.)

Defendants deny that they took race into account during these events. (*Id.* 31:12–17.) Blumenthal claims that Honan did not inform him that Plaintiff was African American. (*Id.* 22:20–22.) Honan and Blumenthal both say that they never discussed the race of tenants, and Honan claims that he would not ever communicate such a thing to Blumenthal. (*Id.* 31:12–17; Honan Dep. 80:13–14.) Blumenthal never met Plaintiff in person. (Blumenthal Dep. 5:9–10.) Blumenthal claims that the only communication he received from Honan about Plaintiff occurred when Honan first presented him with Plaintiff's LOI. (*Id.* 18:13–20.)

V.  **Responsibility Among Defendants**

All parties agree that Blumenthal, not Honan, makes leasing decisions and selects the

9

tenant where there are multiple offers on the table. (Pl.'s SOUMF ¶ 49.) As Honan describes things, "I don't make the decisions, but we, you know, discussed . . . tenants, sure. . . . Qualifications, yeah, startup business, established business in town." (Honan Dep. 66:13–19.)

Honan discussed every LOI with Blumenthal. (Blumenthal Dep. 17:4–8.) But where an offer had not been made, Honan did not "discuss everything on the negotiation with a potential client" with Blumenthal. (*Id.* 13:11–17.) "[Honan] wouldn't contact [Blumenthal] with everybody he showed the space to, but when he thought something was serious or if [they] were going to get an offer he'd let [Blumenthal] know." (*Id.* 6:3–6.) As a general matter, RRG made the decision whether a prospective tenant "had a serious offer" and whether to bring that to Blumenthal. (*Id.* 9:15–10:1.)

Rosetto, by his own description, does not closely monitor negotiations. (Rosetto Dep. 23:15–18, ECF No. 28-21 (Q: "How far or how deep do you get involved in the agent and the client?" A: "Not that deep, especially on a small matter like this.").) He notes that, "[I]t's very difficult to try to monitor a leasing agent or a sales agent when they're out in the field." (*Id.* 26:1–7.) Rosetto monitors "some" potential clients. (*Id.* 22:20–24.) As he describes:

> I will look at the lead sheets and say, well, what happened to this person or what happened to that person. I'm working with them and that's pretty much the extent of it. As long as that agent is in contact with that lead, that's fine. They have the responsibility to take it from there.

(*Id.* 23:9–14.) With the property in question, Rosetto claimed to know only that "a letter of intent or a deal was in the works." (*Id.* 26:16–23; *see also id.* 36:2–3 ("I knew . . . there were a number of [LOIs], but that's about the extent of it.").) Rosetto claims no knowledge as to why potential tenants did not lease the property in question. (*Id.* 36:5–7.) Honan did not explain to Rosetto why a lease was not extended to Plaintiff. (*Id.* 36:25–37:3.) Rosetto did not ask Honan "what was going on with the property . . . until there was an issue." (*Id.* 36:8–10.) Rosetto could not

recall whether he reviewed any of the relevant LOIs when he realized there was an issue in this case. (*Id.* 36:11–14.)

That being said, Rosetto did instruct Honan at least twice to follow up on particular leads on this property. (*Id.* 32:21–35:4.) Specifically, Rosetto emailed Honan, "Take the lead, get offer" with regards to Rafferzeder. (*Id.* 34:11–35:4.)

### VI.  **The Present Case**

Plaintiff brought this case in April 2017, claiming disparate treatment by Defendants in negotiating leases and in selecting renters. (*See generally* Compl.) He alleges violations of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a), against RRG (Count I), Emcee Properties (Count IV), and Rosetto and Blumenthal (Count VII). (Compl. ¶¶ 36–39, 48–51, 60–65; Pl.'s Br. in Suppt. at 12–13.)[9] He alleges violations of the Fair Housing Act, 42 U.S.C. § 3604(a), against the same Defendants (Counts II, V, and VIII). (Compl. ¶¶ 40–43, 52–55, 66–69.) He alleges discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-4, against RRG (Count III) and Emcee Properties (Count VI) (Compl. ¶¶ 44–47, 56–59; Pl.'s Br. in Suppt. at 13),[10] and alleges aiding and abetting of discrimination in violation of NJLAD, N.J.S.A. § 10:5-12(e), by Rosetto at RRG (Count IX) and by Blumenthal at Emcee Properties (Count X) (Compl. ¶¶ 70–81).[11]

---

[9] Plaintiff's Complaint alleges violations of Title II in general, without citation to a particular section of the statute (*see generally* Compl.), while Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment cites specifically to § 2000a(a) (at 12). The Court therefore construes Plaintiff as alleging violations of § 2000a(a).

[10] As with the Title II Counts, Plaintiff's Complaint alleges violations of NJLAD in general, without citation to a particular section of the statute (*see generally* Compl.), while Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment cites specifically to § 10:5-4 (at 12–13). The Court therefore construes Plaintiff as alleging violations of § 10:5-4.

[11] Though Honan has been joined as a Defendant, the Complaint alleges no Counts explicitly against him. Even so, the claims brought against RRG can reasonably be construed against Honan, as each implicates "RRG's supervisors and other agents." (Compl. ¶¶ 37, 41, 45.)

On July 26, 2018, Emcee Defendants filed for summary judgment. (ECF No. 26.) The next day, Plaintiff filed for summary judgment (ECF No. 28), as did RRG Defendants (ECF No. 27). On August 6, 2018, Plaintiff timely opposed both of Defendants' Motions (ECF No. 30), and both groups of Defendants timely opposed Plaintiff's Motion (ECF Nos. 29, 31). RRG Defendants timely replied on August 13, 2018. (ECF No. 32).

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Consequently, "[s]ummary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Anderson*, 477 U.S. at 248).

In resolving a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits." *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. More precisely, summary judgment should be granted if the evidence available would

not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

### I. Title II Claims (Counts I, IV, and VII)

42 U.S.C. § 2000a(a) states, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any *place of public accommodation*, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." (emphasis added). "Place of public accommodation" includes:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests . . . ;
> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
> (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

§ 2000a(b). Notably absent from this list are barber shops and hair salons. *See Fazzio Real Estate Co. v. Adams*, 396 F.2d 146, 149 (5th Cir. 1968) (holding that a barber shop inside a hotel is covered under § 2000a(b)(4) because of its location within the hotel, and therefore implying that a stand-alone barber shop would not be covered). Likewise, commercial real estate available for lease does not fall under the statutory definition of "place of public accommodation." Therefore, even construing all facts in a light most favorable to Plaintiff, Defendants have not run afoul of §

13

2000a(a), and summary judgment must be granted in favor of Defendants.

## II. Fair Housing Act Claims (Counts II, V, and VIII)

42 U.S.C. § 3604 makes it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a *dwelling* to any person because of race, color, religion, sex, familial status, or national origin.
(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a *dwelling*, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(emphasis added). The statute defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." § 3602(b). Here, the property was commercial—not residential—real estate, and therefore not a dwelling. *See Parkins v. An*, 2008 WL 934409, at *2 (D.N.J. Mar. 31, 2008) (refusing to apply § 3604(a) to a commercial lease); *see also United States v. Columbus Country Club*, 915 F.2d 877, 881 (3d Cir. 1990) (providing a working definition of "residence"). Since the Fair Housing Act does not apply to the residential real estate involved in this case, Defendants' Summary Judgment Motion must be granted with regards to the Fair Housing Act claims.

## III. NJLAD Claims (Counts III, VI, IX, and X)

A. *RRG's and Emcee Properties' Alleged Discrimination in Violation of § 10:5-4 (Counts III and VI)*

The NJLAD provides, in relevant part:

All persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any . . . real property without discrimination because of race [or] sex, . . . subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and

14

declared to be a civil right.

N.J.S.A. § 10:5-4. New Jersey courts have often, though not religiously, used the *McDonnell Douglas* burden-shifting framework in evaluating claims brought under this section. *Compare Jansen v. Food Circus Supermarkets, Inc.*, 541 A.2d 682, 691–92 (N.J. 1988) (applying *McDonnell Douglas*), *with Gerety v. Atlantic City Hilton Casino Resort*, 877 A.2d 1233, 1237–38 (N.J. 2005) ("[W]e have modified the test, as appropriate, to address the specific context involved.") (internal citations omitted), *and Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 907–08 (N.J. 1990) ("[T]he Court has never embraced the *McDonnell Douglas* test literally, invariably, or inflexibly.").

Under the first step of *McDonnell Douglas*, the plaintiff must initially make out a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1974). In a case alleging discrimination in renting, such a prima facie case may be established by demonstrating that (a) the plaintiff belongs to a protected category, (b) he attempted to rent the space and was qualified to rent it, (c) he was rejected, and (d) after the rejection, the space remained vacant and the defendant continued to try to rent it. *See McDonnell Douglas*, 411 U.S. at 802 (stating prima facie case for racial discrimination in employment); *Victor v. State*, 4 A.3d 126, 141 (N.J. 2010) (internal citations omitted) (employment discrimination generally); *Poff v. Caro*, 549 A.2d 900, 904 (N.J. Super. Ct. Law Div. 1987) (sexual orientation discrimination in housing).

In the second step, once the plaintiff has established a prima facie case, the burden of production falls on the defendant to "articulate some legitimate, nondiscriminatory reason for the . . . rejection." *Burdine*, 450 U.S. at 253–56 (citing *McDonnell Douglas*, 411 U.S. at 802).

Then, in Step Three, the plaintiff must "prove by a preponderance that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

15

*Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S at 804). "To survive summary judgment a plaintiff must point to some evidence that is sufficient for a reasonable fact finder to 'either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action.'" *Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 523 (E.D. Pa. 2014) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Here, disputes as to material facts prevent the Court from granting summary judgment for either party. The prima facie case, under Step One of *McDonnell Douglas*, cannot be either proven or disproven from the record because the facts are ambiguous on the question of whether Plaintiff was rejected. Honan claims that he stopped contacting Plaintiff because Campos represented to him that Campos would be acting as Plaintiff's real estate agent from that point forward. (Honan Dep. 85:1–5.) Plaintiff disputes that account and says that he had simply asked Campos to inquire whether the property had been rented. (Rush Cert. ¶¶ 29, 30.) The nature of this critical conversation between Honan and Campos is in dispute, and so the Court cannot determine whether Plaintiff was rejected.

Factual disputes also cloud the analysis under Step Three of *McDonnell Douglas*. Defendants maintain that their rental decisions were purely business decisions, based on price offered and prospective tenants' business reputations. (*See, e.g.*, Blumenthal Dep. 11:2–12:23.) However, the process for gathering and transmitting information on prospective tenants' business reputations was inconsistent. (Honan Dep. 68:19–69:3.) Although Blumenthal claimed a preference for an established business, which he claims made Rafferzeder a more attractive prospective tenant, this fact is seemingly undercut by Rafferzeder's request for a four-year term and his indication that he might retire and sell his business before the five-year term ended. (RRG Defs.' Ex. D.) Furthermore, Blumenthal ultimately signed Fredman's LOI for her to

16

establish a hair salon, but Fredman was not a licensed beautician (Rush Dep. 49:10–11), and Blumenthal had no documentation or first-hand knowledge about her business experience (Blumenthal Dep. 14:2–9). Blumenthal also could not recall in his deposition the degree of Plaintiff's business experience. (*Id.* 18:21–19:3.) The record therefore presents sufficient facts to call into question Defendants' proffered explanations. *See Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). Whether Defendants' explanations are genuine or pretextual will depend on credibility determinations that the Court cannot make. *Anderson*, 477 U.S. at 255. Finally, there is a factual dispute as to what was actually said in the March 20 meeting among Fredman, Blumenthal, and Honan about "fit" and its implications. (Fredman Dep. 41:19–22; RRG Defs.' Reply to Pl.'s SOUMF ¶ 15; Blumenthal Dep. 23:14–17.)

Because genuine disputes of material fact exist, summary judgment on the § 10:5-4 claims cannot be granted.

*B. Rosetto's Alleged Aiding and Abetting in Violation of § 10:5-12(e) (Count IX)*

N.J.S.A. 10:5-12(e) forbids "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." Liability under this provision "require[s] active and purposeful conduct." *Tarr v. Ciasulli*, 853 A.2d 921, 928–29 (N.J. 2004).

> [A] plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."

*Id.* at 929 (quoting *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 129 (3d Cir. 1999)). However, a § 10:5-12(e) violation does not necessarily require a second party; one may aid and abet one's

17

own acts. *Ivan v. Cty. of Middlesex*, 612 F. Supp. 2d 546, 552 n.1 (D.N.J. 2009).[12]

There are some factual disputes concerning Rosetto's involvement in the day-to-day workings of RRG. For example, Rosetto has stated that he does not deeply involve himself with negotiations between Honan and prospective tenants (Rosetto Dep. 23:15–18), but that he does monitor "some" potential clients (*id.* 22:20–24). Additionally, Rosetto emailed Honan specifically instructing him to follow up with two prospective tenants, while nothing in the record suggests that Rosetto did the same for Plaintiff. (*Id.* 32:21–35:4.)

But even resolving all factual disputes in the light most favorable to Plaintiff, a reasonable jury could not find that Rosetto "knowingly and substantially assist[ed] the principal violation" or engaged in "active and purposeful conduct." *Tarr*, 853 A.2d at 928–29. Plaintiff has failed to direct the Court's attention to, and the Court has not found on its own, any evidence showing that Rosetto took action to prevent Plaintiff from renting the property or that Rosetto directed Honan or anyone else to discriminate.

Summary judgment on Count IX must therefore be granted in favor of Rosetto.

C. *Blumenthal's Alleged Aiding and Abetting in Violation of § 10:5-12(e) (Count X)*

Unlike with Rosetto, genuine disputes of material fact exist that prevent summary judgment in favor of either party with regards to NJLAD allegations against Blumenthal. As discussed above, factual disputes prevent the Court from determining whether illegal discrimination occurred at all. Additionally, factual disputes exist concerning Blumenthal's

---

[12] In his briefing, Plaintiff posits that Rosetto is liable under a theory of vicarious liability. (*See, e.g.*, Pl.'s Br. in Suppt. at 20–21.) While vicarious liability is an available theory under some sections of NJLAD, *see, e.g.*, *Cicchetti v. Morris Cty. Sheriff's Office*, 947 A.2d 626, 643 (N.J. 2008) (citing *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 464 (N.J. 1993)), the Complaint alleges that Rosetto violated only § 10:5-12(e) (Compl. ¶¶ 70-75), which, as stated above, requires "active and purposeful conduct," *Tarr*, 853 A.2d at 928–29. The Court therefore will not address vicarious liability theories here.

"aware[ness] of his role as part of" the alleged illegal activity and whether he "knowingly or substantially assist[ed] the principal violation." *Tarr*, 853 A.2d at 929.

While Blumenthal makes the ultimate decisions as to whether to lease to a particular person (Pl.'s SOUMF ¶ 49), it is Honan who decides whether a prospective tenant is serious (Blumenthal Dep. 6:3–6). Blumenthal claims that Honan's only communication with regards to Plaintiff occurred when Honan forwarded Plaintiff's LOI to him (*Id.* 18:13–20), yet Blumenthal and Honan had clearly discussed Plaintiff before, because Blumenthal responded to Plaintiff's LOI with the question, "Is this the barber?" (Rush Cert., Ex. F), and Honan testified that he and Blumenthal regularly discussed tenants (Honan Dep. 66:13–19). There is no smoking gun linking Blumenthal to any discriminatory action, and yet Honan's "right fit" comments, if a jury were to find them credible, could implicate Blumenthal. (Fredman Dep. 41:19–22; RRG Defs.' Ex. M.) These factual disputes, as well as those surrounding Defendants' motives in renting the space, prevent a grant of summary judgment on this Count.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motions for Summary Judgment are granted in part and denied in part. An appropriate order will follow.

Date:   8/29/2018                                        */s/ Anne E. Thompson*
                                                                                                        ANNE E. THOMPSON, U.S.D.J.